Oliver GRANDI, Plaintiff,

v.

## NEW YORK CITY TRANSIT AUTHORITY, Defendant.

Civil Action No. CV–94–5047 (DGT).

United States District Court,
E.D. New York.

Sept. 19, 1997.

John Gregory Kourakos, Kourakos & Kourakos, Bronx, NY, for Plaintiff.

Martin B. Schnabel, Acting Vice President and General Counsel New York City Transit Authority by Joyce Rachel Ellman, Brooklyn, NY, for Defendant.

### MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiff Oliver Grandi, a former New York City Transit Authority ("NYCTA") employee, brought this action pro se pursuant to 42 U.S.C. § 1983, alleging a violation of his right to due process as protected by the Fourteenth Amendment.[1] Plaintiff claims that the NYCTA violated due process by placing him on involuntary medical leave ("IML") without written notice or a hearing, in contravention of New York Civil Service Law § 72. He seeks damages in the amount of seven million dollars. *See* Amend. Compl. ¶ 34. Defendant NYCTA moved for summary judgment. Subsequent to filing his amended complaint, but prior to defendant moving for summary judgment, plaintiff retained counsel. His counsel now moves for permission to file a second amended complaint, adding claims against Alan Kiepper, Gerald Mack, Rubin Salz, Carmen Suardy and David Morales (all NYCTA employees) as well as an equal protection claim. *See* Proposed [Second] Amend. Compl. For the reasons stated herein, defendant's motion for summary judgment is granted and plaintiff's motion to amend the amended complaint is denied.

### *Background*

Oliver Grandi commenced his career as a bus driver at the NYCTA on May 5, 1986 and attained permanent civil service status one year later. *See* Amend. Compl. ¶ 4. On or about August 19, 1991, the NYCTA received a passenger complaint about a bus operator, later identified as plaintiff. The written complaint detailed what the passenger described as a "very dangerous" incident. *See* Def. 3(g), Exh. L According to the passenger complaint:

[T]he driver started a long, loud dialog [sic]. He told some riders sitting toward the front that he knew they were talking about him! He said he had it all on tape, that everything they said was recorded so they could not lie about it. He complained about the harassment he always receives from passangers [sic]. He kept turning toward the back of the bus so he could face the people he was accusing. He was waving his arm while he talked. He had to be

---

1. Plaintiff actually alleges that he brings suit under "U.S.A. Constitutional Amendments, Article 1 and Article 14 Sec. 1." Amend. Compl. ¶ 3.

In light of plaintiff's pro se status at the time he drafted the amended complaint, this will be construed as an action brought under § 1983.

told the light changed from red to green at Woodlawn Blvd. and to open the back door at 89 st. He was still talking quite loudly and complaining about all the harassment he was receiving when I left the bus at 89 st. I may have dismissed this as a one time case of irritability, but—the same thing happened the Sunday before, with the same driver at the same time of day.

*Id.* (emphasis omitted)

On October 7, 1991, Superintendent Paul Mandel with General Superintendent G.W. Mack confronted plaintiff with this passenger complaint. *See* Amend. Compl. ¶ 7; Def. 3(g) ¶ 17. During this meeting, Grandi admitted to the conduct and "stated . . . that he has to confront passengers who harass him. He further stated, he held up a tape recorder and told passengers who were speaking about him in Spanish, he recorded their conversation." Def. 3(g) Exh. M. Based on the October 7 meeting, Grandi was told on October 14, 1991 to report to the Medical Services Department for a determination of his fitness to continue his employment. *See* Def. 3(g) ¶ 17; Pl. 3(g) ¶ 6(f). He continued driving a bus between October 7 and October 14. *See* Pl. 3(g) ¶ 6(e).

On October 14, Grandi met with Dr. Lowitt of the Medical Services Department, who found plaintiff unfit to operate any NYCTA vehicle, referred him to the Employee Assistance Program ("EAP"), and placed him on restricted duty. *See* Def. 3(g) Exh. N. Plaintiff was kept on restricted duty after meeting with David Morales of EAP on October 23. *See id.* Exh. O; Pl. 3(g) ¶ 6(g).

On October 28, Grandi met with Dr. Bowles of the Medical Services Department. According to the amended complaint, on this date, "Transit Medical . . . placed me on involuntary leave of absence . . . on 'restricted duty' ('R.D.') **no work status,** with the mandate that I/plaintiff had to obtain a psychiatric evaluation, in order to return to work." Amend Compl. ¶ 10 (emphasis added). Representatives from EAP and Transit Medical met with plaintiff at least eleven times during the subsequent year to continue to gauge his psychiatric status.[2]

Plaintiff contends that the NYCTA violated his due process rights by placing him on IML in this manner, in contravention of the procedure set forth in Civil Service Law § 72. Plaintiff makes two arguments in this respect. First, he claims that he should have been given written notice of the reasons he was sent to the Medical Department. *See* Amend. Compl. ¶ 10; Pl. 3(g) ¶ 6(j). Section 72 of the Civil Service Law states that "[w]ritten notice of the facts providing the basis for the judgment of the appointing authority that the employee is not fit to perform the duties of his or her position shall be provided to the employee . . . prior to the conduct of the medical examination." N.Y. Civ. Serv. Law § 72 (McKinney 1983 & Supp.1997). Second, Grandi argues that, in contravention of § 72, he was not given written notice of the reasons he was placed on IML after he saw the NYCTA doctors. *See* Amend. Compl. ¶ 10; Pl. 3(g) ¶ 6(j). According to § 72: "An employee placed on leave of absence pursuant to this section shall be given a written statement of the reasons therefor."[3] N.Y. Civ. Serv. Law

---

**2.** Plaintiff was seen by persons from EAP or Transit Medical on: October 30, 1991; November 6, 1991; November 18, 1991; November 20, 1991; December 18; January 21, 1992; February 11, 1992; March 11, 1992; April 13, 1992; May 11, 1991; and June 15, 1992. *See* Def. 3(g) Exh. P. After each of these meetings it was recommended that plaintiff's no work status continue.

**3.** Although these are the claims plead in the amended complaint, plaintiff's counsel introduces an additional argument relating to plaintiff's termination pursuant to Civil Service Law § 73 in plaintiff's 3(g) statement. Section 73 allows for termination of an employee who has been absent from work for one year due to a

non-occupational disability. *See* N.Y. Civ. Serv. Law § 73 (McKinney 1983 & Supp.1997). Although plaintiff's amended complaint does not dispute that he was placed on no work status on October 28, 1991, see Amend. Compl. ¶ 10, in plaintiff's 3(g) statement drafted by his counsel, he states that "[i]t was not until November 6, 1991 that Grandi was put on 'no-work status.'" Pl. 3(g) ¶ 6(1). However, plaintiff's 3(g) statement also contains the contradictory statement: "On October 28, 1991, Grandi was removed from work. . . ." Pl. 3(g) ¶ 6(h). Plaintiff now argues that he could not have been terminated pursuant to § 73 until November 6, 1992. *See* Pl. 3(g) ¶ 6(1).

This does not amount to a dispute regarding a genuine issue of material fact, however, because

§ 72 (McKinney 1983 & Supp.1997). Plaintiff claims that because he was deprived of written notice at these two critical junctures defendant violated his due process rights.

The NYCTA, however, claims that it was not required to follow this procedure because § 72 of the Civil Service Law was supplanted by the collective bargaining agreement ("CBA") that plaintiff's union, the Transport Workers Union, had entered into with defendant. The CBA provides:

> An Involuntary Medical Leave ('IML') Grievance is hereby defined to be a complaint on the part of any covered employee that would otherwise be subject to Sections 72 and/or 73 of the Civil Service Law that he or she has been improperly placed on such involuntary leave and the procedures contained herein shall be in lieu of any administrative procedure specified in Sections 72 and/or 73 of the Civil Service Law.

Def. 3(g) Exh. U § 2.1(A)(3); *see id.* § 2.1(D)(1).

Within the IML Grievance Procedure section, the CBA states: "Nothing in these procedures shall prevent the Authority from placing an employee on an involuntary leave of absence where such leave has been determined to be appropriate by the Authority's Medical Department."[4] Def. 3(g) Exh. U § 2.1(D)(2). Defendant argues that this provision governs placement of union members on IML and permits it to place a union member on IML when the Medical Department of the NYCTA determines that it would be appropriate to do so without any additional procedures.

The CBA also contains a clear process for challenging placement on IML, including a step hearing, a medical examination by an impartial physician and arbitration. *See* Def. 3(g) Exh. U § 2.1(D). Although the CBA provided plaintiff with these procedures, Grandi did not pursue any of these options. Plaintiff's union representative even attempted to help plaintiff challenge his placement on IML. See Def. 3(g) Exh. V. In a letter dated August 4, 1992, Grandi's union representative writes: "As per your request, here is the paperwork for the involuntary medical leave grievance. Please read it and return it at your convenience, because a hearing must be scheduled with Labor Relations. You must supply all medical documentation to justify your position." *Id.* On October 1, 1992, plaintiff wrote at the bottom of this page: "I did not request such." *Id.* Thus, although the CBA contains an elaborate procedure for challenging placement on IML, plaintiff chose not to avail himself of this process.

Defendant also produces a document from plaintiff's union representative that chronicles the union's unsuccessful attempts to assist plaintiff in filing a contract interpretation

---

plaintiff does not even allege in his amended complaint that his termination pursuant to § 73 was untimely. Moreover, only one document in the record supports the claim that plaintiff was not separated from work until November 6, 1991—a medical record signed by Dr. Bowles on October 28 recommending that Grandi continue on *restricted* work status. *See* Def. 3(g) Exh. P. However, in Dr. Bowles's Medical Services Department Report dated January 21, 1992, she notes that he has been on no work status since October 29, 1991. *See id.* Most importantly, when plaintiff received documents from the NYCTA mistakenly stating that he was placed on no work status on October 13, plaintiff wrote them to indicate that he was in fact placed on no work status on October 28. *See* Def. 3(g) Exh. Q. A letter from NYCTA to plaintiff dated October 14, 1992 states: "This is to acknowledge receipt of your letter dated October 8, 1992 in which you note that you performed restricted work from October 14, 1991 to October 28, 1992[sic]. A

review of your time records confirms your claim. Accordingly, we will amend the date that the Authority intends to terminate your employment pursuant to Section 73 of the Civil Service Law to October 28, 1992." *Id.* Moreover, plaintiff himself also indicated to the New York State Department of Labor that he was placed on medical leave with no work on October 28. *See* Pl. 3(g) Exh. 14. Thus it is clear that both NYCTA and plaintiff understood that plaintiff was placed on no work status on October 28, 1991 and that he would be subject to termination on October 28, 1992.

4. This version of the CBA governs grievances filed after July 10, 1988. A different version of the CBA controls grievances filed after July 1, 1992. However, the sections of the 1992 CBA are substantively identical to the 1988 provisions quoted above, and differ only in that the IML grievance is called a Medical Appeal Grievance. *See* Def. 3(g) Exh. U §§ 2.1(A)(3) & 2.1(D)(2).

grievance[5] between June 20, 1992 and August 18, 1992. This record reveals plaintiff's lack of cooperation and general hostility toward the union in spite of attempts to use the procedures outlined in the CBA to assist plaintiff. *See* Def. 3(g) Exh. V.[6]

Plaintiff was notified by letter of his impending termination by Rubin Salz, the Director of Labor Relations, on both April 17, 1992 and September 10, 1992. The letters state:

> The Authority records indicate that you have been unable to perform the duties of your position due to an injury/illness suffered on October 13, 1991.[7] You have not appealed or disputed this determination of disability.
>
> . . .
>
> If you continue in your current status, the Authority may seek termination of your employment after one year.
>
> . . .
>
> Should your medical condition change, please notify the undersigned immediately.

Def. 3(g) Exh. Q.

On October 27, 1992—one day before plaintiff knew he would be terminated—he submitted a letter dated September 18, 1992 from David F. Wilson, C.S.W. and Dr. Warren Gold, M.D. (Senior Psychiatrist) stating that "after a six month evaluation period it is our clinical opinion that Mr. Grandi suffers from no psychiatric or emotional disorder that should prevent his returning to work." Pl. 3(g) Exh. 9. Plaintiff offers no explanation whatsoever for why he failed to deliver this letter to the NYCTA until over a month after he received it and until only one day before he knew he would be terminated.[8] This letter was deemed inadequate by the NYCTA on October 27, 1992 and plaintiff was instructed to produce a more specific letter regarding his mental health. *See* Pl. 3(g) Exh. 10.

The NYCTA sent plaintiff a letter dated October 28, 1992,[9] notifying him that "pursuant to section 73 of the Civil Service Law, the Transit Authority has terminated your employment effective October 28, 1992." Def. 3(g) Exh. Q. The letter also outlined the many post-termination remedies available to plaintiff under section 73. *See id.*

Subsequent to his termination plaintiff obtained another letter from the psychiatrists, *see* Pl. 3(g) Exh. 11, filed a contract grievance pursuant to the CBA, which was denied originally and on appeal, *see* Def. 3(g) Exh. V, and filed a charge of disability discrimination and retaliation with the EEOC, but failed to sue within 90 days of receipt of the right to sue letter and thus lost his right to sue under the ADA. *See* Def. 3(g) Exhs. H & I. This § 1983 action alleging deprivation of due process was filed on October 28, 1994.

## Discussion

### (1)

Although the facts surrounding plaintiff's claim are plentiful, the only salient issue on this motion for summary judgment is whether the NYCTA was bound to adhere to Civil

---

5. A contract interpretation grievance is "a complaint on the part of any covered employee ... that there has been on the part of Management, non-compliance with or a misinterpretation of any of the provisions of this Agreement or of any written rule...." Def. 3(g) Exh. U § 2.1(A)(1).

6. It is also noteworthy that on November 25, 1991 Grandi filed a complaint with the State Division of Human Rights ("SDHR"), claiming that he was discriminated against based on the perceived disability of paranoia. *See* Def. 3(g) ¶ 11; Exh. D. SDHR found no violation on July 8, 1994. *See id.* Exh. E.

7. As mentioned earlier, this date was amended, on plaintiff's instigation, to October 28, 1991. *See* Def. 3(g) Exh. Q.

8. However, a letter to plaintiff dated December 17, 1992 from Councilwoman Mary Pinkett may illuminate this issue. This correspondence details the many steps Ms. Proctor, her aide, had taken to help plaintiff and describes that "[e]very suggestion [she] made was met with a negative response from you or rationale as to why you were not able to take her advice." Def. 3(g) Exh. V at 2. Councilwoman Pinkett also writes: "Ms. Proctor inquired of you as to whether you wanted your job back or not and your response was that you did not want your job back, you wanted to indict the union and management for conspiracy and had evidence to bring against them." *Id.* at 1.

9. Grandi claims that he did not receive this letter until a month after it was mailed. *See* Pl. 3(g) ¶ 6(n).

Service Law § 72 when placing plaintiff on IML.

Plaintiff vociferously contends that plaintiff had a vested property right in his job and could not be placed on IML absent the procedural prerequisites embodied in Civil Service Law § 72. In support of this proposition, he cites several cases from the Southern District of New York. *See Roach v. City of New York,* 782 F.Supp. 261 (S.D.N.Y.1992); *Laurido v. Simon,* 489 F.Supp. 1169 (S.D.N.Y.1980); *Snead v. Department of Social Services of New York,* 355 F.Supp. 764 (S.D.N.Y.1973) (subsequent history omitted).[10] However, all of these cases are easily distinguished from the one at bar.

In *Snead,* the court declared a prior version of Civil Service Law § 72 unconstitutional for failing to require an adversarial hearing prior to placing permanent civil service employees on IML. *See Snead* 355 F.Supp. at 773. *Laurido* similarly declared the same prior version of § 72 unconstitutional, holding that "[a]bsent exceptional circumstances requiring immediate action, before such an involuntary leave may be effectuated, the employee is entitled to notice of the facts on which the employer's determination is made and an adversarial-type hearing." *Laurido,* 489 F.Supp. at 1177–78 (footnote omitted). More recently, the *Roach* court held that the plaintiff's due process rights had been violated when her city employer failed to comport with the procedures in the current version of § 72 before placing her on IML. *See Roach,* 782 F.Supp. at 265–66.

However, *Snead, Laurido* and *Roach* are factually inapposite because a CBA had not supplanted the procedures outlined in the Civil Service Law. In this case, however, the CBA between the Transport Workers Union and the NYCTA clearly replaced the provisions of § 72: "[T]he procedures contained herein shall be in lieu of any administrative procedure specified in Sections 72 and/or 73 of the Civil Service Law." Def. 3(g) Exh. U § 2.1(A)(3); *see id.* § 2.1(D)(1). Thus even if plaintiff had a due process right to the § 72

scheme, his union waived these rights in the CBA with defendant.

The legality of such waiver is clearly established in New York. *See, e.g., Romano v. Canuteson,* 11 F.3d 1140, 1141 (2d Cir.1993); *Harris v. Nassau Cty. Dep't of Social Services,* 134 A.D.2d 499, 521 N.Y.S.2d 282, 283 (2d Dept.1987), *rev'd on other grounds,* 73 N.Y.2d 886, 538 N.Y.S.2d 241, 535 N.E.2d 294 (1988); *Carroll v. Gunn,* 116 A.D.2d 686, 497 N.Y.S.2d 753, 755 (2d Dept.1986). In *Romano,* the plaintiff argued that "as a public employee, he had a right to be heard prior to suspension without pay and that this right could not be waived in a collective bargaining agreement." *Romano,* 11 F.3d at 1141. The Court of Appeals for the Second Circuit roundly rejected this argument, writing that "[o]ver a decade ago, New York State courts announced that due process requirements are not of controlling relevance if the party seeking to assert them has waived them in a ... collective bargaining agreement." *Id.* (citing, inter alia, *Antinore v. State of New York,* 49 A.D.2d 6, 371 N.Y.S.2d 213 (4th Dept.1975), *aff'd,* 40 N.Y.2d 921, 389 N.Y.S.2d 576, 358 N.E.2d 268 (N.Y.1976)).

The fact that plaintiff himself did not sign the CBA or may not approve of this waiver of his due process rights is immaterial.

> The fact that this plaintiff did not himself approve the agreement negotiated by his representative and now disclaims satisfaction with one aspect of the agreement makes it no less binding upon him.... Plaintiff, as employee, has the benefits of the contract; he must accept also what he may regard as the disadvantages, for in the bargaining process it may well be that the latter were assumed in exchange for the conferral of the former.

*Antinore,* 371 N.Y.S.2d at 217. Plaintiff's dissatisfaction with the CBA is an issue for him to raise with the union, not with defendant.

Plaintiff argues that the cited cases do not apply to this case because they discuss CBA provisions that supplant Civil Service Law §§ 75 or 76, rather than § 72. Plaintiff contends while there is express statutory lan-

---

**10.** In spite of the lengthy subsequent history of *Snead,* in no instance did a higher court ratify or adopt the court's reasoning or conclusion with respect to the unconstitutionality of the statute.

guage within § 76 that permits a CBA to replace or modify §§ 75 or 76, see N.Y. Civ. Serv. Law § 76(4) (McKinney 1983 & Supp. 1997), there is no such language in § 72. Plaintiff claims that § 72 may not be "supplemented, modified or replaced" by a CBA in absence of explicit statutory authorization like that found in § 76.

Aside from the fact that nothing in the Civil Service Law indicates that the procedures set forth in § 72 may not be modified or replaced by a CBA, neither policy nor New York case law suggests that there must be an affirmative grant of authority to displace sections of the Civil Service Law other than §§ 75 and 76. One might reasonably infer a requirement of express statutory authorization if the CBA were to seriously compromise the protections afforded by § 72. However, the revised procedures in the CBA have been negotiated by plaintiff's union representatives, who, one would expect, would protect the interests of their employee members. And indeed, the CBA does appear to provide substantial protections to the employees. Although the CBA does not provide remedies to plaintiff prior to placement on IML, it includes a host of post-placement, but pre-termination remedies, including examination by an impartial physician as well as a hearing before an arbitration board. See Def. 3(g) Exh. U § 2.1(D). Thus, there is no reason to read New York law as requiring an affirmative grant of statutory authority for a CBA to displace the procedures of § 72.

Moreover, New York case law supports this analysis. For example, Carroll reads: " 'It has been repeatedly held that a contract provision in a collective bargaining agreement may modify, supplement, or replace the more traditional forms of protection afforded public employees, **for example,** those in section 75 and 76 of the Civil Service Law....' " Carroll, 116 A.D.2d 686, 497 N.Y.S.2d 753, 755 (2d Dept.1986) (emphasis added) (quoting Dye v. New York City Transit Auth., 88 A.D.2d 899, 450 N.Y.S.2d 587, 588 (2d Dept. 1982), aff'd, 57 N.Y.2d 917, 456 N.Y.S.2d 760, 442 N.E.2d 1271 (N.Y.1982)); see Harris v. Nassau Cty. Dep't of Social Services, 134 A.D.2d 499, 521 N.Y.S.2d 282, 283 (2d Dept.

1987), rev'd on other grounds, 73 N.Y.2d 886, 538 N.Y.S.2d 241, 535 N.E.2d 294 (1988). For these reasons, plaintiff's argument is unpersuasive. Because this case presents no genuine issue of material fact, defendant's motion for summary judgment will be granted.

(2)

Although summary judgment is granted because the CBA supplanted Civil Service Law § 72, recent case law suggests that even if this was not the case, plaintiff would not have a valid § 1983 cause of action against the NYCTA. Jannsen v. Condo, 101 F.3d 14 (2d Cir.1996) casts into serious doubt the due process holdings in Snead, Laurido and Roach. In Jannsen, plaintiff argued that she was deprived of her entitlement to a leave of absence and a hearing pursuant to § 72 when she was terminated from her job. Jannsen, 101 F.3d at 16. In a per curiam opinion, Judges Winter, Altimari and Walker held: "Section 72 does not create an entitlement because it provides a discretionary course of action for employers.... This section does not mandate the employer to grant a leave of absence and a corresponding hearing, but rather permits the procedure." Id. at 16–17 (emphasis in original). Although the plaintiff in Jannsen was a probationary employee, rather than a permanent civil servant like Grandi, the court's statement does not appear to draw a distinction on that ground. Thus, in spite of the fact that Jannsen does not specifically address the written notice requirements of § 72, the case implies that even if the CBA did not supplant § 72, plaintiff's due process rights would not have been violated by defendant's failure to furnish written notice despite the mandatory language ("shall") of § 72.

Moreover, even though Grandi did not receive formal written notice of the reason for his referral to Transit Medical, defendant here called him to a meeting to discuss the passenger complaint that had been lodged against him. This, in fact, afforded plaintiff even more process than a summary written notice would by providing Grandi with the opportunity both to hear the complaint and comment on its accuracy. After this meeting, plaintiff was instructed to appear before

the Medical Department to determine his fitness for duty. These facts most certainly indicate that plaintiff was fully informed of the basis for his medical examination—and thus the failure to provide him written notice was a failure of form, rather than substance. Thus it is entirely likely that summary judgment would be appropriate even in absence of the CBA.

Although plaintiff seeks to amend his complaint to add additional parties and claims, such amendment would be futile in light of the discussion above. Accordingly, plaintiff's motion is denied.